Arnold L. Fein, J.
On Saturday, October 29, 1966, at about 1:00 a.m., plaintiff drove Ms specially equipped 1965 Cadillac up to El Morocco, the corporate defendant’s nightclub. Other cars were parked at the curb, so plaintiff double-parked his car. A man wearing a French Foreign Legion type uniform, in front of the premises, helped plaintiff and his guests out of the car. Plaintiff testified the uniformed man said he would park the car and that plaintiff should ‘ ‘ leave the keys in the ignition ”. Plaintiff left the car with the motor running and the keys in the ignition and entered El Morocco with his guests, after telling the uniformed man to be careful not to “nick” the car while parking it.
They remained in the club until about 3:00 a.m. When they emerged, the uniformed man handed plaintiff the car keys and said, “ The car is gone. It’s not here.” Plaintiff went back into the club and complained to the maitre d’, at whose suggestion and in whose presence plaintiff phoned the police, who had not been previously advised of the car’s disappearance. Plaintiff then went outside and walked around the block looking for Ms car.
On cross-examination plaintiff testified he had been at defendant’s club on many prior occasions. In the courtroom, he identified the man with whom he had left the car. Plaintiff did not receive a claim check, nor did he pay any fee. He did not tell the man where to park the car. Plaintiff testified without objection he “ assumed it would be parked in front of El Morocco ”. When plaintiff came out of the establishment the uniformed man stated he had parked plaintiff’s car on Second Avenue, between 54th and 55th Streets, around the corner from El Morocco, and that it was gone. After plaintiff notified the police, and before their arrival, he again talked to the uniformed man. Plaintiff then walked around the block with a man he described as the uniformed man’s assistant, looking for the car without success. Later that night, plaintiff and a police detective toured the area looking for the car, which was never found.
In his deposition, read on behalf of plaintiff, defendant’s managing director, who stated he had held this post since September, 1966 and that his duties encompassed “most everything that is involved in the running of the club ”, testified:
“ Q. On Saturday, October 29, 1966, did El Morocco have some arrangement for parking the cars of its patrons when they would drive up beside the restaurant? A. No.
*321 “ Q. I’d like to repeat that question with the explanation that by ‘ arrangement ’ I mean any form of procedure or plan to which El Morocco was a party and which had as its purpose the parking of cars of patrons when they drove up to the restaurant at that time. What is your answer to that? A. Still no. • • •
“ Q. Do you know one Vincent Giovanni, the codefendant in this action? A. I would say yes, with reservations. I don’t know his exact name, but I know there’s a Vincent.
“ Q. Have you any record of his name? A. I don’t. The corporation may have. I have no knowledge of it.”
Although it was agreed the name and address, if available, would be inserted in the transcript, this was not done. Nor was the information ever supplied before the trial.
The deposition of the managing director continued:
“ Q. What is this person Vincent’s function at El Morocco? A. He has no function with El Morocco per se.
“ Q. In what way, if any, is he connected with El Morocco in its operation of a restaurant at 307 East 54th Street? A. In no way.
“ Q. Would your answer be the same for the date in question, Saturday, October 29, 1966? A. Yes.
“ Q. Was there a uniformed person at the door after midnight on Saturday, October 29, 1966? A. To the best of my knowledge I would say yes.
“ Q. What was his name? A. We call him Vincent or Vinnie.
“ Q. This is the same person we have been referring to? A. I imagine so; I don’t know.
“ Q. Can you describe his uniform? A. Well, it varies. I would say it’s striped trouser with a raincoat and a sort of French hat. * * *
“ Q. What did he do on Saturday, October 29, 1966, while on duty? A. I couldn’t answer that. He wasn’t on duty. I don’t know. I’m not outside, I couldn’t tell you what he does outside.
“ Q. How long has Vincent been wearing this uniform outside El Morocco, regularly? A. I couldn’t honestly answer that.
“Q. To your knowledge, has he been there since September, 1966? A. On and off.
“Q. When he has not been there — has there been someone else in his place with that uniform or something like it? A. Yes.
“Q. Has that person been connected with El Morocco as an employee? A. No.
“ Q. Did Vincent when he came to El Morocco bring this uniform with him or did he obtain it from any part of the club ? A. To the best of my knowledge he brought it with him.
“ Q. Did he ever enter the club? A. Yes.
“ Q. Did he enter the club regularly on the days he came to El Morocco? A. If you leave out the ‘ regularly ’ I’d say yes.
“Q. Was there a written or oral understanding between El Morocco and Vincent relating to his services or the means of compensation? A. I don’t know. * * *
“ Q. Do you know what this person Vincent would do during hours he spent at El Morocco or immediately outside El Morocco in uniform? * * •
A. To the best of my knowledge he parks cars.
“ Q. Has he been doing this regularly on and off since September, 1966 ? A. Yes.
“ Q. Do you know anything about the procedure used by Vincent in parking the ears of patrons at El Morocco? A. No.
*322 322
56 MISCELLANEOUS REPORTS, 2d SERIES
“ Q. Do you know whether Vincent himself would park these ears or whether he entrusted them to others to park? A. I wouldn’t know.
“ Q. Do you know anything about where these cars would be parked ordinarily? A. I don’t know.
“ Q. During what hours would Vincent work on the days he came to El Morocco ? A. To the best of my knowledge it would be around 8:00 or 8:30.
“ Q. At night? A. At night, p.m.
“ Q. Until when? A. That I couldn’t tell you either.
“ Q. Since September, 1966, how many days a week did Vincent come to El Morocco up to Saturday, October 29, 1966, on a weekly basis? A. I couldn’t answer that.
“ Q. Can you say whether it was more than three days per week? A. It might be.
“ Q. Might it be more than five days per week? A. It might.
“ Q. Did Vincent do anything else outside El Morocco besides park cars ? A. I wouldn’t know.”
The witness then acknowledged that he had been advised of the plaintiff’s complaint.
Plaintiff rested. Decision on defendant’s motion to dismiss was reserved.
Defendant’s witness, Vincent Di Giovanni, the person identified by plaintiff as the uniformed man in front of El Morocco, testified that he was the doorman at El Morocco. He greeted patrons of El Morocco, assisted them out of cabs and cars, called cabs and cars for patrons, and parked cars when asked to by patrons. He' wore a uniform which he supplied. He worked several nights a week, always at the door, outside the club. He had no assistants and no one took his place on nights he was not there. No one else parked cars at El Morocco, although sometimes patrons’ chauffeurs helped him. He parked about 30 to 35 cars on the night of the incident. He normally parked approximately 60 to 70 cars during a six-day week. Most of the cars were “classy” cars. He knew there was a public parking lot on the same block and a public garage in the area. However, he customarily parked the cars of El Morocco’s patrons on 54th Street, west of Second Avenue, in the same block as the club, and also east of Second Avenue, toward First Avenue, and on the west side of Second Avenue, between 54th and 55th Streets. He also parked cars for the patrons of other restaurants in the area.
He confirmed plaintiff’s tesimony as to what had occurred on plaintiff’s arrival at the club except that he testified plaintiff asked him to park the car. After assisting plaintiff and his guests into the club, Di Giovanni drove the car around the corner and parked it on the west side of Second Avenue, between 54th and 55th Streets, at a point which could not be observed from in front of the club. He locked the car, returned *323 to El Morocco and put the keys on an unattended key rack inside the club, with other patrons’ car keys. Sometime before 3:00 a.m., when he went around the corner for another patron’s car, he observed plaintiff’s car was gone.• He thought plaintiff might have taken the car himself. Di Giovanni had been around the corner several times between 1:30 and 3:00 a.m. for other patrons’ cars. He had not observed plaintiff’s car was missing prior to 2:45 a.m. at the earliest. He returned to El Morocco and saw that plaintiff’s keys were still on the rack. He took them off the rack and started looking for the car. When he could not locate it, he went back to El Morocco. Plaintiff was just emerging. He told plaintiff what had happened and gave him the keys. The man who helped plaintiff look for the car was a chauffeur whom Di Giovanni had asked to help because plaintiff was angry and doubted Di Giovanni’s word as to what had happened and where he parked the car.
Di Giovanni claimed he was not questioned by the police until two days later.
Both sides then rested. Each moved for a directed verdict and then stipulated that the case be decided by the court without the jury. Defendant stipulated that for purposes of this case: (1) Di Giovanni was an agent or employee of defendant El Morocco, acting within the scope of his authority; and (2) this was a bailment for mutual benefit.
It is necessary first to dispose of defendant’s motion to dismiss on plaintiff’s case. Plaintiff made out a prima facie case that this was a bailment. Personal property was delivered for a particular purpose with the understanding that it be redelivered to the person leaving it or kept until he reclaimed it. There was a transfer of lawful possession, care, custody and control. (Davidson v. Madison Corp., 257 N. Y. 120; Foulke v. New York Cons. R. R. Co., 228 N. Y. 269; see Hogan v. O’Brien, 123 Misc. 865, affd. 212 App. Div. 193; Osborn v. Cline, 263 N. Y. 434, 437; Potomac Ins. Co. v. Donovan, 274 App. Div. 666.) It is not necessary to consider whether the same conclusion would be required had there been instructions which were complied with to park the car in a particular place or had the keys been returned to plaintiff immediately upon parking the car. In such case the bailment might have then terminated. (Mays v. New York, New Haven & Hartford R. R. Co., 197 Misc. 1062.) Despite the curious testimony of defendant’s managing director there was sufficient evidence in plaintiff’s case on which to find Di Giovanni, the man in the uniform, was acting within the scope of his authority as agent of defendant and for its benefit. At a minimum the *324 evidence would sustain a determination that defendant held him out as its employee performing the duties of a doorman, including the parking of patrons’ cars. (See Potomac Ins. Co. v. Donovan, supra.) It is immaterial that no claim check was furnished and no fee charged. There was an obvious benefit to defendant from this service. Moreover, even if the service were gratuituos, this would only affect the degree of care. (Dalton v. Hamilton Hotel Operating Co., 242 N. Y. 481; Hunter Trucking Co v. Glatzer, 285 App. Div. 314; Mays, Inc. v. Herts Corp., 15 A D 2d 105.)
Plaintiff established a prima facie case by proving delivery to defendant’s agent and failure to redeliver upon demand. The burden of going forward shifted to defendant bailee (Clafin v. Meyer, 75 N. Y. 260; Hasbrouck v. New York Cent. & Hudson Riv. R. R. Co., 202 N. Y. 363; Fidelity & Guar. Ins. Corp. v. Ballon, 280 App. Div. 373; Roy Bros. v. Dana Trucking Co., 52 Misc 2d 355). It was necessary for defendant to go forward with evidence “ to show the circumstances of the loss in order to rebut the presumption of negligence ” arising from the failure to return or redeliver (Jay Howard, Inc. v. Rothschild, 16 A D 2d 628; Fidelity & Guar. Ins. Corp. v. Ballon, supra; Textile Overseas Corp. v. Riveredge Warehouse Corp., 275 App. Div. 236). Defendant’s motion to dismiss on plaintiff’s case is denied.
Di Giovanni’s testimony added little except that it more firmly established the fact of his agency, finally conceded by defendant’s stipulation at the close of the case. The question is whether his conduct rose to the dignity of that degree of care requisite in a bailment for mutual benefit, the care and diligence which prudent men exercise in the conduct of their own affairs. (Hasbrouck v. New York Cent. & Hudson Riv. R. R. Co., supra; Potomac Ins. Co. v. Donovan, supra; Jay Howard, Inc., v. Rothschild, supra; Pettinelli Motors v. Morreale, 39 Misc 2d 813.) Although one might have assumed that a nightclub such as El Morocco would provide garage or parking lot facilties, there was no evidence in this case on which to base such conclusion. Moreover, plaintiff’s voluntary testimony that he presumed the car would be parked in front of El Morocco negates any such determination. It amounted to a concession he expected his car would be parked in the street. “ A person who parks his car in the street of course takes the risk of leaving it unattended.” (Osborn v. Cline, 263 N. Y. 434, 437.) However, parking a car in front of El Morocco does not mean parking it just anywhere. It implies at least parking it where it could be kept under some degree of obser *325 vation. Although there was no evidence such instruction was given to or agreed to by Di Giovanni, it is appropriate to find this degree of care warranted under the circumstances.
The burden of proof on the whole case was on the plaintiff to show the loss was occasioned by the negligence of the defendant. (Claflin v. Meyer, supra; Mays, Inc., v. Herts Corp., supra, Osborn v. Cline, supra.) It is common knowledge that the streets of New York City have become one vast parking lot, day and night, sometimes to the profit of the city. The court must judicially notice that a host of people park their own cars overnight, unattended, in the city streets. However, this does not necessarily measure the standard of care. The test is not the care one actually uses for his own property, although this is entitled to consideration. (Pattison v. Syracuse Nat. Bank, 80 N. Y. 82; Patriska v. Kronk, 57 Misc. 552.) The fact that Di Giovanni left the keys on an unattended rack in the nightclub for two hours evidenced negligence, although there was no proof the keys had been removed by anyone except Di Giovanni. The evidence is undisputed that he turned the keys over to plaintiff, two hours later. Even though it has not been shown that such negligence was a proximate cause of the loss (Douglas v. Reymont Props., 86 N. Y. S. 2d 60; Arnold v. Kensington Plaza Garages, 179 Misc. 697; Henderson v. Park Cent. Motors Serv., 138 Misc. 183), it is evidence of the lack of care in handling the subject of the bailment. Di Giovanni’s testimony that he went back to the rack to look for the keys is evidence plaintiff or any one else could have taken them without let or hindrance.
Di Giovanni testified he parked the car on Second Avenue at a point where it could not be observed from his station in front of the nightclub. He conceded it was a ‘ ‘ classy ’ ’ car but he did not inspect its location or make any patrol during the two-hour period involved. He parked other ‘' classy ’ ’ cars equally far from his sight. As long ago as 1912, it was held that a bailee who parked a horse and wagon for a similar period and did not keep it under observation was chargeable with negligence. (Kleiner v. Cohn, 75 Misc. 116, [App. Term, 1st Dept., Lehman, J.].) Although the horse and buggy days are gone and a locked car is not a horse and wagon, the applicable degree of care under the circumstances has not lessened. The point of that case is that the bailee is required to use that degree of care requisite under the circumstances. As there stated: “ It seems to me that the defendants exercised absolutely no care to safeguard the plaintiff’s property * * * unattended in the street * * * a constant temptation to *326 a thief.” (Kleiner v. Cohn, 75 Misc. 116-117.) It is easier to steal a horse and wagon than a locked car. However, the theft of a locked car, not under some measure of observation, is unfortunately no great feat. There' was a failure to keep the car within view or some measure of observation for two hours. Whether parking in that location for that period violates the traffic regulations does not appear. The circumstances of -the parties and the nature of the subject of the bailment are pertinent factors. (Nargi v. Parking Assoc. Corp., 36 Misc 2d 836; Mays, Inc., v. Hertz Corp., supra; Henderson v. Park Cent. Motors Serv., supra.) Defendant was negligent in that it failed to exercise that degree of care required of a reasonably prudent operator of a nightclub such as El Morocco for motor vehicles of the type owned by plaintiff.
After trial, judgment for the plaintiff in the stipulated sum of $2,000 against defendant El Morocco International Ltd., only, Di Giovanni not served.